UNITED STATES, Appellee

v.

Paul A. RICHARDSON, Lance Corporal
United States Marine Corps, Appellant

No. 04-0218

Crim. App. No. 200101917

United States Court of Appeals for the Armed Forces

Argued November 9, 2004

Decided May 20, 2005

BAKER, J., delivered the opinion of the Court, in which
GIERKE, C.J., and CRAWFORD, EFFRON, and ERDMANN, JJ., joined.

Counsel

For Appellant: Captain Rolando R. Sanchez, USMC (argued);
Lieutenant Elysia G. Ng, JAGC, USN (on brief).


For Appellee: Lieutenant Guillermo J. Rojas, JAGC, USNR
(argued); Colonel M. E. Finnie, USMC, Commander C. N. Purnell,
JAGC, USN, and Lieutenant Frank L. Gatto, JAGC, USNR (on brief).


Military Judge: J. F. Havranek


THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

Judge BAKER delivered the opinion of the Court.

Appellant was tried by a general court-martial composed of officer members. Contrary to his pleas he was convicted of possessing 52.4 pounds of marijuana with the intent to distribute and importing that marijuana into the United States in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a (2002). The adjudged and approved sentence included a dishonorable discharge, confinement for eight years, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade, E-1. Citing United States v. Tardif, 57 M.J. 219 (C.A.A.F. 2002), the United States Navy-Marine Corps Court of Criminal Appeals approved the findings, but granted Appellant four months of confinement relief on the sentence for unreasonable post-trial delay in the review of his case. United States v. Richardson, NMCCA 200101917 (N-M. Ct. Crim. App. Aug 22, 2003) (unpublished).

## Background

Appellant challenges the composition of his court-martial panel on the ground of implied bias.[1] In particular, he argues the military judge erred in not excluding three members for

---

[1] We granted review of the following compound issue:

WHETHER THE LOWER COURT ERRED WHEN IT DETERMINED THAT THE MILITARY JUDGE DID NOT ABUSE HIS DISCRETION DURING VOIR DIRE BY APPLYING AN "ACTUAL BIAS" STANDARD TO DENY THE DEFENSE'S THREE "IMPLIED BIAS" CHALLENGES AND BY PREVENTING THE DEFENSE FROM FULLY DEVELOPING THE FACTS TO SUPPORT THE CHALLENGES TO MEMBERS WHO WERE OR HAD BEEN TRIAL COUNSEL'S CLIENTS.

2

cause who had current or prior professional contacts with the trial counsel, Captain (Capt) M. P. Gilbert.  In support of this argument, he contends that the military judge incorrectly applied the standard for actual bias to his challenges for cause rather than the standard for implied bias.  In the alternative, Appellant argues the military judge erred by refusing to reopen voir dire to afford defense counsel the opportunity to further question the challenged members in order to test whether any of them should be excused on the ground of implied bias.

During voir dire, four of the original ten members indicated some previous professional contact with the trial counsel:  Lieutenant Colonel (LtCol) K. P. Spillers, a squadron commanding officer; LtCol P. B. Coz, a group commanding officer (CO); LtCol S. Heywood, a group operations officer; and Major (Maj) P. F. Callan, a squadron executive officer (XO).  The following exchange occurred between LtCol Spillers and the military judge:

> Q.  How is it that you know Captain Gilbert?
> A.  He's the group legal officer.  And I've communicated
>     with him for legal advice from time to time.
>
> Q.  Is there anything about your knowledge of him that's
>     going to cause you to either look at this case either
>     more favorably or disfavorably . . . than anything
>     else?
> A.  No.

Although defense counsel's voir dire of this member was lengthy, his questions did not address the member's prior contact or relationship with trial counsel.

The military judge's relevant questions to LtCol Coz were:

Q. You said that you know Captain Gilbert. How is it that you know him?
A. Captain Gilbert is the -- I'm the CO of PASD and MAG [Marine Aircraft Group]-39. And I have had some legal problems that I discussed with Captain Gilbert.

Q. Is your relation with Captain Gilbert -- would that affect you in any way or the way you evaluate either side's case?
A. I don't believe so, no.

Defense counsel was afforded the opportunity to question this member as well. However, none of counsel's questions touched on the member's professional relationship with the trial counsel.

The exchange between the military judge and LtCol Heywood on the issue follows:

Q. You also said, sir that you know Captain Gilbert. How is it that you know him?
A. Just professional discussions regarding legal matters when I was the XO of 367, like over the phone a couple of time [sic].

Q. Is there anything from your relationship or your knowledge of Captain Gilbert that's going to cause you to view the government's case either more favorably or less favorably than the defense case?
A. No.

After the military judge's inquiry, defense counsel was afforded the opportunity to question the member. Although defense counsel questioned this member as to several aspects of his

4

background, he did not inquire into the member's professional relationship with the trial counsel.

The relevant portion of the military judge's inquiry of Maj Callan, the fourth member to indicate previous professional contact with the trial counsel, follows:

    Q.  You said that you know Captain Gilbert.  How is it that
        you know him?
    A.  In my capacity as an Executive Officer at the squadron.
        I deal mostly -- I'm over the phone with him sometimes
        for advice and counsel on some of the legal matters
        that we have in the squadron.

    Q.  Do you think that your relationship with him is going
        to effect [sic] the way you would view his case or the
        government's case either whether it would be more
        favorably or less favorably than say the defense case?
    A.  Not at all.

In contrast to the three previous members, when allowed to question this member, defense counsel explored the member's relationship with trial counsel.  Portions of the colloquy between the two follow:

    Q.  You're currently the executive officer of a squadron?
    A.  Yes, sir.

    Q.  And how long have you been in that special position?
    A.  A year and a half.

    Q.  And for how long during that period of time has the
        trial counsel been the advisor to your squadron?

    . . . .

    A.  Four to six months at the most.

    Q.  Okay.  In that capacity, he comes to you and to the
        Commanding Officer and sometimes to him or to you

5

          depending and he provides you advice regarding cases of Marines in your unit.  Is that correct?

A.  In almost all cases it's us contacting him.

. . . .

Q.  But once that [the Request for Legal Services] is sent down to the Legal Team Echo, where the Captain resides, he becomes your advisor on these cases?

A.  Correct.

Q.  And that advice extends depending on the cases or whether this -- what forum these ought to go to: Should it go to an Article 32 [UCMJ, 10 U.S.C. § 832 (2000), investigation]?  Should it go to a special [court-martial]?  And often times during the course perhaps having referred it to a special providing guidance regarding other matters.

A.  It goes -- could be matters which we talked, but in my particular experiences dealing with specifically with the Captain, they were just interpretation on legal matters and legal policy, not necessarily or specifically about types of court-martial -- courts-martial.

Q.  He provides you guidance on pretrial agreements.  The buck ends either at your desk or CO's desk, but he does provide you guidance.  Is that true?

A.  If I asked him at [sic] question, I'm sure he would.  I don't specifically remember ever asking him a question about pretrial agreements.

Q.  If you had an Article 32, he would perhaps provide you some advice as to whether the case was won, whether he thought he could win, whether it would do well at the general court-martial?

A.  It would be speculation on my part about whether he would provide or could provide --

Q.  You've not had one?

A.  No.

Q.  Okay.  You call him up and -- from time to time and say, I've got a case.  And I'm a little perplexed by it.  And I'd like to get your cut at it?

A.  That would be the nature of it.  It's always general in nature.

. . . .

```
Q.  How many times a week or a month -- you pick the period
    to make it reasonable -- would you say you talk to
    Captain Gilbert relating to legal matters?
A.  Once a month.

Q.  Okay.  Is that because you have a few cases?
A.  No.  Because probably the majority of the communication
    is between the legal officer and Captain Gilbert.  And
    I'll specifically -- I only call if I have additional
    questions or clarification that I require.
```

. . . .

```
Q.  Has Captain Gilbert been a good legal advisor?
A.  Yes, sir.

Q.  Would you describe him as a trusted legal advisor?
A.  Yes.

Q.  Have you had occasion to be in positions in other units
    where you've had to go out and get legal advice from
    someone like Captain Gilbert?
A.  No.
```

At the close of voir dire civilian defense counsel asked to "briefly recall three of the members" to allow him "to look at and to expand on . . . the issue with the relationship with the trial counsel."  In particular, defense counsel stated:

> I want to sure [sic] that the evidence is fully developed
> under [Rule for Courts-Martial (R.C.M.)] 912(1)(f)(N). . .
> . This is a special relationship in which the trial
> counsel, in particular, should we have a conviction and we
> get on to sentencing, is going to be in the posture of
> effectively making a recommendation to persons to whom he
> makes recommendations regularly, who presumptively believe
> that he is a wise counsel, and who rely on his counsel.
> That gives me some pause.

7

The military judge denied this request stating, "All the members that have said that they know Captain Gilbert said that they would not give him any special deference whether for or against him.  I trust them on their word and what they've said . . . I think there's been enough that's been brought out."

Following this ruling, defense counsel challenged a total of seven members for cause, including the four who had indicated prior contact or a professional relationship with the trial counsel.  Specifically, he challenged five members on the basis of implied bias, the four mentioned above and one other because LtCol Heywood was his reporting senior (Maj D. A. Sobyra).  He challenged the two other members because they were the commanding officer and the executive officer of the same unit (LtCol C. W. Hocking and Maj S. B. Frosch).  When asked by the military judge if he wished to be heard on the challenges, trial counsel made the following remarks with respect to the members with whom he had had previous professional contact:

> Lieutenant Colonel Spillers has been talked to I think on almost three occasions.  On these three occasions, it's dealt with a hazing issue and one [JAG Manual investigation].

> Lieutenant Colonel Coz, I think, I've talked to him about three or four times.

> Lieutenant Colonel Heywood, I don't remember ever seeing that individuals [sic] face, Your Honor, I'm sure if he says that he talked to me over the telephone I talked to him.

8

Major Callan, I've heard of him but never met him in person. I have -- I'm assuming talking to him over the phone . . . . I typically deal directly with Lieutenant Colonel Veyna. And for the most extent I deal with the CO of the MAG which is Colonel Jensen. So my contact with these individuals is limited, Your Honor. And with that we would ask that you deny that motion for challenge for cause on that ground.

After hearing from trial counsel the military judge made the following ruling:

Now, as to those I denied challenges for cause, it may be just as easy to explain why I granted the challenges for cause for the other ones to explain why I did not grant Lieutenant Colonels Coz, Heywood, Hocking, or Major Callan.

As to Major Sobyra in taking in consideration everything that he answered to concerning implied bias he has three family members who've all been law enforcement, one [his brother] specifically is involved at the border and with law enforcement. Here he has a reporting senior as a member on the panel as well as the close friend that he's had for a number of years and specifically that his brother was involved as I noted in law enforcement activity that is directed towards the border.

As to Major Frosch, I considered the fact that he said it would be a distraction for either he or Lieutenant Colonel Hocking that they are the CO and XO and that it could be a distraction from this court-martial if they both remained on. So in granting him, I denied Lieutenant Colonel Hocking because that seemed to be the only basis for Lieutenant Colonel Hocking. So my reasoning is: I granted to Major Frosch and denied to Lieutenant Colonel Hocking.

Lieutenant Colonel Spillers in considering an implied bias, I took a number of factors into consideration: His extensive workings with the JTF-6 [Joint Task Force Six] for a two year time period. The fact that he currently has friends that are working in drug interdiction involved in JTF-6 and then to a very lesser degree his dealings with the trial counsel, Captain Gilbert.

9

> As for Lieutenant Colonel Coz, I did not find that there was an implied bias because I did not find such significant aspects as I did with the other members who I did grant the challenge for cause.
>
> The same would be true for Lieutenant Colonel Heywood and for Major Callan. I did not believe that there was an implied bias that exists in there. And in making that determination, I specifically relied upon their answers here in court and they're [sic] demeanor as I observed it in their answering. I believe that they said that they could follow the instructions as I gave them. And they would not give deference to either side.

After the military judge's ruling, three of the four members who originally indicated a prior professional relationship with the trial counsel remained on the final panel of six members.[2]

The Government's argument is that the military judge did not err because the record discloses a lengthy exchange during voir dire, in which the military judge, the parties, and the members participated, and which included discussion of trial counsel's legal support to four of the members. In particular, the officers in question all responded that they would be impartial in their consideration of trial counsel's arguments. Further, the Government notes, the military judge granted three of Appellant's challenges for cause, including two on the ground of implied bias. Thus, the military judge demonstrated a willingness to excuse members when warranted. Finally, the Government contends that the professional relationships at issue here are more tangential than the social relationship between

---

[2] Defense counsel exercised his peremptory challenge against another member reducing the final panel to six members.

the trial counsel and a member in United States v. Downing, 56

M.J. 419 (C.A.A.F. 2002), a case affirmed by this Court.

## Discussion

"As a matter of due process, an accused has a

constitutional right, as well as a regulatory right, to a fair

and impartial panel." United States v. Wiesen, 56 M.J. 172, 174

(C.A.A.F. 2001). R.C.M. 912(f)(1)(N) provides that a member

shall be excused for cause whenever it appears that the member

"[s]hould not sit as a member in the interest of having the

court-martial free from substantial doubt as to legality,

fairness, and impartiality." In furtherance of this rule,

military judges are required to test the impartiality of

potential panel members on the basis of both actual and implied

bias. A military judge's ruling on a challenge for cause is

reviewed for an abuse of discretion. United States v.

Armstrong, 54 M.J. 51, 53 (C.A.A.F. 2000). Military judges are

afforded a high degree of deference on rulings involving actual

bias. See Wiesen, 56 M.J. at 174. By contrast, issues of

implied bias are reviewed under a standard less deferential than

abuse of discretion but more deferential than de novo. United

States v. Strand, 59 M.J. 455 (C.A.A.F. 2004). As we have often

stated, "implied bias is reviewed under an objective standard,

viewed through the eyes of the public," United States v.

Napoleon, 46 M.J. 279, 283 (C.A.A.F. 1997), and it is intended

to address the perception or appearance of fairness of the military justice system. Wiesen, 56 M.J. at 174. Actual bias, on the other hand, tests the expressed views of members. Challenges for actual or implied bias are evaluated based on a totality of the circumstances. See Strand, 59 M.J. at 459.

The procedural vehicle for testing for member bias is voir dire. "Voir dire examination serves to protect [the right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors." McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984). "Generally, the procedures for voir dire are within the discretion of the trial judge." United States v. Jefferson, 44 M.J. 312, 318 (C.A.A.F. 1996). R.C.M. 912(d) provides that:

> The military judge may permit the parties to conduct the examination of members or may personally conduct the examination. In the latter event the military judge shall permit the parties to supplement the examination by such further inquiry as the military judge deems proper or the military judge shall submit to the members such additional questions by the parties as the military judge deems proper.

The discretion of the military judge, however, is not without limits. "The standard of review is whether there was a clear abuse of discretion by the judge in denying individual or group voir dire." Jefferson, 44 M.J. at 317 (internal quotation marks and citations omitted). In Jefferson, for example, this Court reversed on the ground that the military judge failed to reopen

12

voir dire so that defense counsel could inquire regarding two members' statements that they or a close friend or relative had been a victim of crime. We recognized that when it occurs to counsel conducting the voir dire that further inquiry was omitted on a critical issue, "judges should be patient and allow that inquiry to be conducted." Id. at 322.

Applying the law in this case, we agree with the Government that the appellate record before us today does not demonstrate grounds for removing LtCols Coz and Heywood on the basis of implied bias. With respect to these members, the record only reflects that they knew the trial counsel based on his provision of legal services to their commands and that the members stated that their prior contact with counsel would not affect their deliberations at Appellant's court-martial.

Defense counsel's voir dire of Maj Callan presents a more complete picture and a closer question of implied bias. On the one hand, like the other three potential members with prior professional contact with trial counsel, Maj Callan also agreed that his relationship with the trial counsel would not affect whether he viewed the Government's case more or less favorably than the defense case. And trial counsel stated, "I've heard of him but never met him in person." On the other hand, Maj Callan agreed trial counsel was "a good legal adviser" and "a trusted

13

legal advisor," which might suggest to a public observer a pre-existing and favorable bond.

However, we need not ultimately decide whether or not the military judge erred with respect to defense counsel's challenge to Maj Callan on this record. This is because we agree with Appellant that the military judge erred by not conducting further inquiry into the nature of the trial counsel's professional relationship with LtCols Heywood and Coz as well as Maj Callan for the purpose of determining whether and how those relationships might have implicated the doctrine of implied bias. In short, we do not have sufficient facts either to reach this conclusion, or to preclude its possibility.

The potential for concern is magnified in this context because whatever the qualitative nature of trial counsel's professional relationships with these members, we do know that much of the advice rendered was in the area of criminal law. This raises the possibility that trial counsel may have already established a rapport with three of the six members on criminal matters or sentencing issues that might have arisen at Appellant's court-martial. In such a context, the military judge had a responsibility to further examine the nature of relationships in the context of implied bias review, particularly when asked to do so by defense counsel. Thus, in this case the appearance of a panel biased in favor of the trial

counsel was heightened where three of the final members had prior professional contact with trial counsel and the military judge declined to explore fully, or to allow defense counsel to explore fully, the nature of the prior professional contact.

We recognize that in military practice, the qualitative nature of the relationships between trial attorneys and officers in the commands those attorneys advise will cover a wide range of experiences. Some officers, including commanders, and the attorneys will establish a close personal and professional bond based on shared experience, for example, combat service, or regular garrison contact. In other contexts, the contact may be singular or passing; formal and professional, but not indicative of special deference or bonding. Moreover, in deployed circumstances, one lawyer may have professional contact with many, if not all, of the senior members of a command who might serve as panel members within that command. Thus, we decline to adopt a per se ground for challenge, while at the same time emphasizing the importance of thorough voir dire in such circumstances.

The present record tends to suggest formal and professional relationships, but not ones marked by particular bonding suggesting deference. At this point, however, we do not ultimately know where on the continuum these particular relationships resided. Further inquiry was warranted when

15

requested by defense counsel. Among other things, in this case, further voir dire might have explored whether the members were predisposed to crediting trial counsel's views on the application of the criminal law in Appellant's case or his views on sentencing over the views of the military judge or defense counsel. Alternatively, these panel members might simply have viewed trial counsel as just another lawyer whom they were required to consult in a prior context. Regarding LtCol Coz, for example, further voir dire might have determined what "the legal problems" in question were and how they were resolved. In addition, trial counsel essentially was allowed to give an unrebutted account of his professional relationship with Maj Callan. Further voir dire might have explored the difference between Maj Callan's perception of trial counsel as a trusted legal adviser, and counsel's statement that "I've heard of [Maj Callan] but never met him in person."

Implied bias review is more than, as the Government suggests, a question as to whether the members were honest when they said they would be fair. There is nothing in the record to suggest otherwise. Moreover, Appellant has not challenged on the ground of actual bias. But in the context of implied bias, this case is not about the members' integrity. Taking into account the military judge's determination that the members were truthful in their responses, the question is would the public

16

nonetheless perceive the trial as being less than fair given the nature of the prior and existing relationships between trial counsel and certain panel members?

Nor are we in a position to defer to the military judge's conclusions. It is clear in the record that the military judge considered implied bias in his ruling. He stated so, and his ruling followed lengthy argument by both counsel on implied bias. However, the record does not contain a statement of the standard used by the military judge in his ruling or an application of that standard. Among other things, the military judge's ruling does not provide an explanation as to why and how LtCol Spillers's relationship with Capt Gilbert factored "to a very lesser degree" into his grant for cause on the ground of implied bias, but was not addressed or distinguished with respect to LtCols Heywood and Coz or Maj Callan. This is particularly noteworthy because LtCol Spillers's responses to the military judge's questions on this issue were almost identical to those of LtCols Heywood and Coz. As we stated in Downing, "[w]e do not expect record dissertations but . . . a clear signal that the military judge applied the right law. While not required, where the military judge places on the record his analysis and application of the law to the facts, deference is surely warranted." 56 M.J. at 422.

Finally, our opinion in this case should not be read to necessarily bar the participation of members who might have had previous or current official contact with the trial participants. To the contrary, we recognize that in a close-knit system like the military justice system, such situations will arise and may at times be unavoidable. But where such situations are identified, military judges should not hesitate to test these relationships for actual and implied bias. And a factual record should be created that will demonstrate to an objective observer that notwithstanding the relationships at issue, the accused received a fair trial. Member voir dire is the mechanism for doing so.

### Conclusion

In this case the prior professional contacts between trial counsel and three of the six seated members at appellant's court-martial, including conversations related to criminal law matters, warranted further inquiry in light of defense counsel's challenges for implied bias and his request to conduct further voir dire. Moreover, unlike the defense counsel in Jefferson, counsel in this case sought to ask additional questions while voir dire was still ongoing. Accordingly, we conclude that the military judge abused his discretion by failing to apply the correct legal standard for implied bias to the challenges of LtCols Heywood and Coz and Maj Callan. There was a further

abuse of discretion in the denial of counsel's request to reopen voir dire in a case raising implied bias considerations.

## Decision

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed. Ordinarily, we would order a remand to that court with instructions either to supplement the record with information regarding the three members at issue or to order a hearing pursuant to United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967). However, we conclude that in this case, further fact-finding offers little prospect of addressing the considerations raised in this case. Appellant's court-martial occurred over five years ago. We conclude that it is unfair to Appellant and to the officers concerned to ask those officers to recall now under oath the circumstances of their professional contact with trial counsel, and to do so in sufficient detail to permit implied bias review. The interests of justice and the administration of military justice are better served by deciding this case now, rather than by setting in motion a further cycle of fact-finding and delay, which may in the end fall short of applicable legal standards.

The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.