**UNITED STATES**

v.

**Carole L. CAMACHO, Aviation Storekeeper First Class (E–6), U.S. Navy.**

**NMCM 9900893.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 7 Oct. 1998.

Decided 11 April 2003.

Lt Jonathan R. Goodman, JAGC, USNR, Appellate Defense Counsel.

Lt Deborah S. Mayer, JAGC, USNR, Appellate Government Counsel.

Before PRICE, Senior Judge, CARVER and BRYANT, Appellate Military Judges.

PRICE, Senior Judge:

Contrary to her pleas, the appellant was convicted of violation of a lawful general regulation by possessing drug paraphernalia and six specifications of wrongful use of methamphetamine, in violation of Articles 92 and 112a, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 912a. A special court-martial consisting of officer and enlisted members sentenced the appellant to confinement for six months, reduction to pay grade E–1, forfeiture of $617.00 pay per month for six months, and a bad-conduct discharge. The convening authority approved the sentence as adjudged.

We have carefully considered the record of trial, the five assignments of error,[1] and the Government's response. With one exception, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c). We will take corrective action in our decretal paragraph.

### Facts

The appellant was assigned as the Petty Officer–in–Charge of the Fleet Aviation Specialized Operational Training Group Pacific Fleet (FASOTRAGRUPAC) Detachment at Naval Air Station (NAS), Fallon, Nevada. On the evening of 24 February 1998, the appellant was stopped by a civilian police officer while driving a Government van off station. Aviation Structural Mechanic (Hydraulic) First Class (AMH1) Anthony Hollister, a command investigator at NAS Fallon, soon arrived at the scene. The appellant was subsequently placed under military apprehension for alleged misuse of that van.[2]

---

1. I. APPELLANT'S CONVICTION FOR CHARGE II AND ALL SIX SPECIFICATIONS ARE FACTUALLY AND LEGALLY INSUFFICIENT.

II. THE EVIDENCE WAS FACTUALLY AND LEGALLY INSUFFICIENT TO SUPPORT CHARGE I, VIOLATION OF A LAWFUL GENERAL ORDER THROUGH POSSESSION OF DRUG PARAPHERNALIA.

III. THE URINALYSES CONDUCTED ON APPELLANT WERE NOT VOLUNTARY AND SHOULD HAVE BEEN SUPPRESSED.

IV. RULE FOR COURTS–MARTIAL 805(d)(1) IS UNCONSTITUTIONAL, BOTH ON ITS FACE AND AS APPLIED TO APPELLANT, IN THAT IT VIOLATES APPELLANT'S RIGHT TO A FAIR TRIAL, HER SUBSTANTIVE DUE PROCESS RIGHTS, AND EQUAL PROTECTION UNDER THE LAW.

V. THE COURT–MARTIAL LACKED JURISDICTION TO PROCEED, AND THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY NOT ORDERING A MISTRIAL.

2. The Government dismissed a charge alleging violation of a lawful general regulation related to the appellant's use of the van before the court was assembled.

During a search incident to her apprehension, AMH1 Anthony Hollister seized a butane torch from a bag located between the two front seats in the van. Also located in the bag were some wire clips. No drugs or other objects of interest were found in the bag. AMH1 Hollister noted that the appellant had dilated pupils and a discolored tongue. She was also fidgeting and seemed excitable.

The appellant was escorted back to NAS Fallon, where she admitted that the bag and the torch were hers. She explained that she used the torch and the wire clips for a beadwork hobby. Since no drug residue was apparent on the torch, it was never sent to a lab for testing.

The appellant consented, in writing, to a urinalysis, and provided a sample. The command urinalysis coordinator, Chief Machinist's Mate (MMC) Crawford, however, concluded that the sample needed to be discarded. Another sample was obtained from the appellant.

The appellant was subsequently placed on legal hold and reassigned from FASOTRA-GRUPAC to NAS Fallon, where she was assigned to work for MMC Crawford, who also served as the Chief Master-at-Arms for NAS Fallon. During the next several weeks, MMC Crawford asked the appellant for her consent for urinalyses on three other occasions. The appellant orally agreed to each request. Each of the four urinalyses of the appellant at NAS Fallon was reported as positive for amphetamine/methamphetamine.

On 7 May 1998, the appellant was placed in pretrial confinement at the Naval Consolidated Brig, Miramar, San Diego, California. On 14 May 1998, she was released and placed in a restricted status aboard NAS North Island, San Diego, California. On 24 June 1998, she was again asked to provide a urine sample. She agreed. It tested positive for the same drugs as the previous four urinalyses.

On 6 July 1998, she was ordered back into pretrial confinement at Miramar. Two days later, she was ordered to take a urinalysis as part of her brig in-processing. She did so and that sample also tested positive for amphetamine/methamphetamine. Each of the six urine samples was tested and analyzed at the Naval Drug Screening Laboratory in San Diego, California.

After the Government and defense rested their cases-in-chief on the merits, and the Government completed its case in rebuttal, the civilian defense counsel raised an issue of potential member misconduct. Evidence was heard on the issue. Ultimately, the senior member was excused, for cause, placing the court below the required quorum. The convening authority detailed new members and trial proceeded to findings and sentencing. Additional facts necessary to understand and resolve the assignments of error will be summarized below.

### Voluntariness of Consent Urinalyses

The appellant contends that the military judge erred in denying motions to suppress the positive results of the first four of her six urinalyses. Specifically, she asserts that the military judge's findings of fact are flawed and that he misapplied the law in ruling that the appellant's consent was voluntary.

Military Rule of Evidence 314(e)(5), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), requires that consent to a search be shown by clear and convincing evidence. The Government bears the burden of proving that consent was freely and voluntarily given. *United States v. Vassar*, 52 M.J. 9, 11 (1999). "A military judge's determination that a person has voluntarily consented to a search, including a urinalysis, is a factual determination that will 'not be disturbed on appeal unless it is unsupported by the evidence or clearly erroneous.'" *United States v. Radvansky*, 45 M.J. 226, 229 (1996)(quoting *United States v. Kosek*, 41 M.J. 60, 64 (C.M.A. 1994)). As to the military judge's legal analysis and conclusions, we will reverse under an abuse of discretion standard only when his ruling was "influenced by an erroneous view of the law." *Vassar*, 52 M.J. at 12.

The voluntariness of a person's consent is determined by the "totality of all the circumstances," including such factors as the "[appellant's] age, education, experience, length of military service, rank, and knowledge of the right to refuse consent, as well as whether the environment was custodial or

coercive." *Radvansky*, 45 M.J. at 229. While there is no Constitutional requirement of proof of knowledge of the right to refuse consent, that is a relevant and important factor in our analysis. *Id.*

■ We now examine the appellant's argument that the facts show she did not voluntarily consent to the first four urinalyses. First, she concedes that the first urine sample she produced on 24 February was voluntarily submitted. Before providing that sample, she signed a standard form that included this language: "I have been informed of my constitutional right to refuse to permit this search in the absence of a search warrant. In full understanding of this right, I have nevertheless decided to permit this search to be made." Appellate Exhibit IV–B. As explained previously, when MMC Crawford arrived, he decided that that sample was unusable and said another sample was necessary. Master–at–Arms Second Class (MA2) Adams went to the appellant and told her another sample was necessary. The appellant's response was "no problem." Record at 90. She provided another sample into a second bottle, but MMC Crawford determined that there was insufficient urine in the bottle for testing. So, after waiting until she was able, the appellant, produced, using the same second bottle, a sample that ultimately tested positive. It was this second sample given on 24 February that the appellant contends was involuntarily produced.

The appellant also complains that MMC Crawford abused his authority in obtaining her consent to the subsequent three urinalyses. The appellant testified that, as to the urinalysis of 11 March, the appellant had a dental emergency that morning and intended to go straight to the dental clinic from her residence. She testified that she first called into work and told a petty officer that she needed to go to Dental. According to the appellant, he told her that she could do so, but "cover your CYA" and report to the Chief afterwards. *Id.* at 115. After two hours passed, with no appearance by the appellant at work, MMC Crawford sent somebody to Dental to look for her. She was not there and did not have an appointment. Accordingly, MMC Crawford sent a Naval Criminal Investigative Service agent and MA2 Adams to her residence. They apprehended her for unauthorized absence (UA) and escorted her to work. MMC Crawford testified that when she arrived, he asked her, "Can I have a urine sample?" *Id.* at 68. The appellant responded, "Sure. I don't have a problem with that." *Id.* at 68, 98. The appellant testified she did not consent, but submitted a sample just so that she could leave and go to Dental.

For the urinalysis of 13 April, the appellant testified that she woke up that morning and found her car was missing. Because she had left her keys in the car, she explained that she did not file a stolen vehicle report, but did file a missing vehicle report. According to her account, when she called into work, MMC Crawford told her she was UA, to get to work and that she would then have to provide a urine sample before she could leave to tend to her personal affairs. The appellant borrowed a car, drove to work, provided the urine sample, and then left.

MMC Crawford testified that, by this point, he felt he could not trust her. He said that she did not want to file a report with the police because friends of hers had taken the car. Suspicious of the circumstances and her story, MMC Crawford asked, "Can I have a urine sample, please." Record at 69. The appellant responded, "Sure, Chief. I don't have a problem with that." *Id.* at 70. Quartermaster Third Class (QM3) Posada, the observer for this urinalysis, corroborated MMC Crawford's account.

After these events, the appellant testified she bought a used car and drove it to Reno, Nevada the following Sunday, 19 April. She said the engine "blew up" and she could not get back to work at NAS Fallon the next day. She called into the quarterdeck and requested MMC Crawford's number. Told that they didn't have it at the quarterdeck, the appellant testified that she waited until the following day and then called him at work. According to the appellant, MMC Crawford told her to get her car fixed and get back to work. When she returned the following morning, she testified that MMC Crawford told her she was UA and that she needed to provide a sample. According to

MMC Crawford's testimony, she did call in on Monday, the 20th. She was told that "the clock's ticking until you get in here." *Id.* at 71. When she next appeared on the morning of 21 April, MMC Crawford asked her for a sample. According to MMC Crawford, she said, "Sure, I don't have a problem with that," then provided the sample. *Id.*

For the urinalyses of 11 March, 13 April and 21 April, the appellant did not sign a consent form, nor was she advised that she had the right to refuse to submit to a urinalysis. Based on these and the other facts set forth above, the appellant contends that MMC Crawford forced her to submit to a urinalysis before she could go to Dental or attend to personal business on each occasion. As to the urinalysis of 24 February, the appellant argues that she was not allowed to leave the Security Office until she had provided an acceptable sample and that she reluctantly provided the sample just to get out of there.

The military judge made extensive findings of fact. Explicitly referencing the "clear and convincing" standard and the "totality of the circumstances" test, he found that the appellant was 39 years old, a high school graduate with 50 college credits, and a well-spoken first class petty officer with over 18 years of service. Record at 143. Of note, he also found that the appellant:

[D]id remember what was on the written consent form for all the subsequent occasions. And even though it would have been better if the government had used a written form on each of the subsequent occasions, there was sufficient knowledge there for Petty Officer Camacho to make a voluntary decision to consent.

*Id.* at 145. He also found that the appellant was never ordered to produce a urine sample, that there was no evidence of coercion, and that her consent to each of the four urinalyses was voluntary. The military judge specifically found that MMC Crawford and the other witnesses called by the Government on the motion were credible. The motions to suppress the urinalyses results were denied. We have carefully considered the evidence taken on the motion, as well as the entire record and conclude that these findings of fact are supported by the record and are not clearly erroneous.

We also reject the appellant's argument that the military judge misapplied the law in denying the motion. Namely, the appellant contends that by imputing her 24 February knowledge of her right to refuse to the subsequent urinalyses, the military judge improperly shifted the burden of proof to the appellant. However, the appellant has not cited us to any precedential authority or cases we find to be persuasive in making this novel argument that "every search stands on its own and must be evaluated independently upon the facts presented." Appellant's Brief of 2 Feb 2001 at 14. While we certainly agree that each urinalysis must be evaluated independent of the others, we know of no rule that precludes the military judge or this court from considering evidence relevant to each of the urinalyses. We conclude that the military judge did not abuse his discretion in denying the defense motions to suppress.

### Sufficiency of Evidence of Wrongful Use of Methamphetamine

■ The appellant also contends that the evidence supporting her convictions for six specifications of wrongful use of methamphetamine is factually and legally insufficient under our superior Court's decision in *United States v. Campbell*, 50 M.J. 154 (1999), *supplemented on reconsideration*, 52 M.J. 386 (2000). Specifically, she argues that because the Government's expert witness could not adequately testify to the probability that she felt any physical and psychological effects from the ingestion of methamphetamine, the members could not have inferred any use to be wrongful. We disagree.

In *Campbell*, our superior Court held that in a prosecution for wrongful use of controlled substances based solely on a positive urinalysis, the prosecution must, through expert testimony, "establish the reliability of the testing methodology and explain the significance of the results of the test of the accused's [urine] sample." *Campbell*, 50 M.J. at 160; *see United States v. Murphy*, 23 M.J. 310, 312 (C.M.A.1987). The Court then specified that the expert testimony must show, among other things, "that the cutoff level and reported concentration are high

enough to reasonably discount the possibility of unknowing ingestion and to indicate a reasonable likelihood that the user at some time would have 'experienced the physical and psychological effects of the drug.'" *Campbell*, 50 M.J. at 160. Two years later, the Court retreated from that requirement. In *United States v. Green*, 55 M.J. 76 (2001), the Court held that:

> If the military judge determines that the scientific evidence-whether novel or established-is admissible, the prosecution may rely on the permissive inference during the case on the merits. A urinalysis properly admitted under the standards applicable to scientific evidence, when accompanied by expert testimony providing the interpretation required by *Murphy, supra*, provides a legally sufficient basis upon which to draw the permissive inference of knowing, wrongful use, without testimony on the merits concerning physiological effects. *See United States v. Bond*, 46 M.J. 86, 89 (1997).

*Green*, 55 M.J. at 81.

At trial, the prosecution presented the testimony of an expert witness, Mr. Robert Czarny, a chemist and Quality Assurance Officer at the Naval Drug Screening Laboratory in San Diego, California. Mr. Czarny explained the testing procedures, the results of the tests and how the results were interpreted. The defense did not object to the admissibility of the test results or the scientific theories or methodologies explained by Mr. Czarny. After our scrutiny of the record, particularly the testimony of Mr. Czarny, we are satisfied that the Government's evidence satisfies existing requirements for proof of wrongful use of a controlled substance based exclusively upon a positive urinalysis. *Id.*

This court's standard of review for sufficiency of the evidence is set forth in Article 66(c), UCMJ:

> In a case referred to it, the Court of Criminal Appeals may act only with respect to the findings and sentence as approved by the convening authority. It may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved. In considering the record, it may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses.

Further, this standard and its application have been recognized and defined by the Court of Appeals for the Armed Forces:

> [U]nder Article 66(c) of the Uniform Code, 10 U.S.C. § 866(c), the Court of [Criminal Appeals] has the duty of determining not only the legal sufficiency of the evidence but also its factual sufficiency. The test for the former is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of [Criminal Appeals] are themselves convinced of the accused's guilt beyond a reasonable doubt.

*United States v. Turner*, 25 M.J. 324, 324–25 (C.M.A.1987).

We conclude that a reasonable factfinder could properly have found, beyond a reasonable doubt, that the appellant wrongfully used methamphetamine, as charged. Moreover, after careful consideration, we are convinced beyond a reasonable doubt that the appellant wrongfully used methamphetamine on each of six occasions.

### Sufficiency of Evidence of Possession of Drug Paraphernalia

■ The appellant also asserts that the evidence was factually and legally insufficient to support findings of guilty of violation of a lawful general regulation by possessing drug paraphernalia. The thrust of this assignment of error is that the Government did not bear its burden in showing that the purported paraphernalia, the butane torch, was used for, or intended to be used for, the ingestion of drugs. While we conclude that the test

for legal sufficiency is satisfied, we are not convinced beyond a reasonable doubt by the Government's proof.

As correctly explained by the military judge in his instructions to the members, the elements of this offense are as follows:

1. There was in effect a certain lawful general regulation in the following terms: Paragraph 6(b) SECNAV Instruction 5300.28(b), dated 11 July 1990, stating in part "Except for authorized medicinal purposes the possession of drug abuse paraphernalia by persons in the Naval service is prohibited;"

2. That the [appellant] had a duty to obey such regulation;

3. That on or about 24 February 1998, at or near Naval Air Station, Fallon, Nevada the [appellant] violated this lawful general regulation by wrongfully possessing drug abuse paraphernalia, to wit, a butane torch; and

4. That the [appellant] possessed this butane torch with the intent to use the butane torch to inject, ingest, inhale or otherwise introduce into the human body in any matter illegal drugs or other illegal controlled substances in violation of law.

Record at 1252; *accord* MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), Part IV, ¶ 16b(1). The military judge also properly instructed the members that any intent to use the torch for use of illegal drugs may be proved by circumstantial evidence.

The Secretary of the Navy Instruction provides helpful guidance "to ensure that innocently possessed objects are not classified as drug abuse paraphernalia." Secretary of the Navy Instruction 5300.28B, Enclosure (1) at ¶ 2 (11 Jul 1990). The instruction lists several "evidentiary factors" to consider in determining whether there is the requisite criminal intent:

a. Statements by the person in possession or by anyone in control of the object concerning its use;

b. The proximity of the object, in time and space, to the unlawful use, possession, or distribution of drugs;

c. The proximity of the object to controlled substances;

d. The existence of any residue of controlled substances on the object;

e. Instructions, oral or written, provided with the object concerning its use;

f. Descriptive materials accompanying the object which explain or depict its use;

g. The existence and scope of legitimate uses for the object in the community; and

h. Expert testimony concerning its use.

*Id.*

The Government contends that the following evidence supports the findings of guilty for this offense. AMH1 Hollister testified that the torch was seized from a bag placed next to the appellant in the van. The appellant admitted to him that the torch was hers. Based on his experience and training in law enforcement, he explained that a torch such as this is commonly used to inhale methamphetamine, by placing the drug in a glass pipe, then heating the pipe with the torch so that the smoke may be inhaled. When arrested, the appellant had dilated pupils, a discolored tongue, and was acting fidgety and excitable, facts we recognize as possible indications of ingestion of methamphetamine. Finally, as evidenced by the positive urinalysis, there was proof beyond a reasonable doubt that the appellant had wrongfully used methamphetamine some time soon before her apprehension and the seizure of the torch.

The appellant argues that the following establishes reasonable doubt about her intent relative to the use of the torch. Despite a thorough search of her person and the van, no drugs were found. Moreover, no other paraphernalia, such as a glass pipe, was found. The torch had no apparent residue upon it, and was never sent to a laboratory for forensic testing. There was no evidence that the torch was in good working order at the time it was seized. The appellant asserted, when the torch was seized by AMH1 Hollister, that she had used the torch only for her beadwork hobby, an assertion that may be corroborated by the wire clips found in the bag with the torch.

We acknowledge that the members may properly have found that the Government's evidence dispelled any reasonable doubt about the appellant's intent and use of the

torch. Her physical appearance and demeanor coupled with her positive urinalysis certainly established that she had been using methamphetamine. Coupled with the proximity of the torch in place and time with the appellant, the members obviously found that the circumstantial evidence established a nexus between possession of the torch and wrongful use of methamphetamine. As a matter of law, we find no fault with this line of reasoning. Thus, we conclude that the evidence was legally sufficient.

However, we are not persuaded, beyond a reasonable doubt, under the factual sufficiency standard. As we see it, the critical link in the chain of circumstantial evidence is the nexus between the torch and the appellant's use of methamphetamine. When the torch was seized, the appellant claimed an innocent use for it, a use partially corroborated by the discovery of the wire clips in the bag. If, instead, the torch were used to ingest methamphetamine, we might expect to find a glass pipe or some other object to hold the drug while it was being heated, then smoked or inhaled by other means. We also note that there was no apparent residue on or around the torch. Nor were there any instructions or descriptive materials in the area. Finally, there is no evidence to suggest the torch had been used in the very recent past, such as to link it with the appellant's use of methamphetamine on or about 24 February 1998. In fact, there was no evidence that the torch even worked. While none of these factors are essential in proof of culpable intent, the absence of such factors certainly weakens the Government's case. Taken as a whole, after careful consideration, we conclude that the evidence as to Charge I and its Specification is factually insufficient.

### Detail of New Members

The appellant asserts that RULE FOR COURTS-MARTIAL 805(d)(1), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.),[3] the rule relied on by the convening authority and the military judge in detailing new members and proceeding with trial, is unconstitutional, both on its face and as applied here. In a related summary assignment of error, the appellant contends that the court-martial

lacked jurisdiction to proceed with the new members and that the military judge erred by not ordering a mistrial. We reject both assignments of error.

We will first describe the background facts in more detail. After the Government completed its case on the merits in rebuttal, the defense stated that there would be one witness in surrebuttal. Because the noon hour was approaching, the members were excused for lunch and the military judge briefly discussed proposed instructions with counsel. The court then recessed.

After lunch, when the court was called back to order in an Article 39(a), UCMJ, session, the civilian defense counsel (CDC) advised the military judge that a Petty Officer Grant would testify that Lieutenant (LT) Imbat, the senior member and President of the panel, had made a statement to LT Ayala that "It's execution time," or words to that effect, while passing each other outside the courtroom. Record at 698. We note that LT Ayala was the unit Legal Officer and a witness for the Government on the merits. The defense argued that, if true, the statement by the senior member of the panel was cause for removal.

The military judge then heard testimony from Engineman Third Class (EN3) Grant, LT Ayala, LT Imbat, the appellant, who was in the area when the alleged statement was made, as well as three other witnesses. Finding that LT Imbat did not make the statement, as alleged, the military judge denied the challenge for cause. *Id.* at 783–85.

The defense then presented one witness in surrebuttal. Just as the military judge called for argument on findings, the CDC renewed his challenge for cause against LT Imbat, and offered additional testimony. Without objection, LT Scruggs, the assistant defense counsel, MMC Crawford, and LT Ayala testified. The military judge then ordered briefs on the challenge issue, as well as procedural options should the challenge be granted. The court recessed for three days.

When the court reconvened, the military judge heard argument on the issues then announced his ruling. He found that "it's at

---

3. This rule is based upon similar provisions in Article 29, UCMJ, 10 U.S.C. § 829.

least equally likely, if not more likely, that LT Imbat did make a statement, as alleged, referring to 'execution time.'" *Id.* at 841. He also found that LT Imbat made certain gestures, including a vulgar one with his finger, towards LT Ayala during recesses of the trial. Based on these findings, the military judge reversed himself and granted the challenge for cause. After LT Imbat was excused, two members remained. Thus, the court fell below the required quorum. Art. 16, UCMJ, 10 U.S.C. § 816.

In an R.C.M. 802 conference, the military judge and counsel discussed the detailing of new members, voir dire of the new members, and how the evidence would be presented to the new members. When the military judge summarized, in detail, that conference on the record, the defense had no objection or motion. Specifically, the defense never moved for a mistrial. In fact, the defense explicitly agreed to a procedure where the new members would be read the testimony, less redactions.[4] *Id.* at 855. Over Government objection, the military judge even granted a defense request that, in addition to having the redacted transcript read to the members, two witnesses, Mr. Czarny and AMH1 Hollister, be recalled to testify.

Four new members were detailed, sworn, and questioned in accordance with standard voir dire procedures. The two "old" members were not present. After challenges, two of the new members were excused. Pursuant to agreement among the military judge and both sides, the trial counsel then read his opening statement to the new members. The defense did likewise. All prior testimony was read to the new members.[5] That concluded the presentation of all evidence to the new members.[6] *Id.* at 963–1152.

At this point, the old members were recalled to the courtroom and joined the new

members. Mr. Czarny and AMH1 Hollister testified, in supplementation of their earlier testimony. Trial on the merits continued in customary fashion, including arguments, instructions, and findings.

■ We now turn to the appellant's contention that R.C.M. 805(d)(1) is unconstitutional, because it violates the appellant's rights to: (1) a fair trial; (2) substantive due process; and (3) equal protection. The rule reads as follows:

> When after presentation of evidence on the merits has begun, a new member is detailed under R.C.M. 505(c)(2)(B), trial may not proceed unless the testimony and evidence previously admitted on the merits, if recorded verbatim, is read to the new member, or, if not recorded verbatim, and in the absence of a stipulation as to such testimony and evidence, the trial proceeds as if no evidence has been presented.

R.C.M. 805(d)(1). In the Discussion, we find the following statement: "When the court-martial has been reduced below a quorum, a mistrial may be appropriate. *See* R.C.M. 915." R.C.M. 805(d)(1), Discussion. The Analysis includes this comment: "This subsection provides a means to proceed with a case in the rare circumstance in which a court-martial is reduced below a quorum after trial on the merits has begun and a mistrial is inappropriate." MCM, App. 21, at A21–45.

The gist of the appellant's constitutional argument is that, in effect, two different panels received the evidence in very different ways, the old panel of two members having had the opportunity to observe the demeanor of all the witnesses with the new panel of two members not having that opportunity. Thus, under the Confrontation Clause of the Sixth Amendment to the U.S. Constitution, the appellant was deprived of her right to have the finders of fact evaluate the demeanor of

---

4. Redactions were made for Article 39(a), UCMJ sessions, testimony ruled inadmissible by the military judge and other similar matters.

5. Two petty officers then took turns reading the testimony of several prosecution witnesses to the new members. The assistant trial counsel read the direct and redirect examination of Mr. Czarny. The detailed defense counsel read the cross and recross examination of Mr. Czarny. All exhibits were published to the new members. The

trial counsel read in the rebuttal testimony. The defense counsel read in the surrebuttal testimony.

6. We are confident that the new members received an accurate rendition of the testimony, because the military judge interrupted readers in several places to make corrections, indicating that he was following along in the transcript.

each of the witnesses. The appellant cites us to *United States v. Anderson*, 51 M.J. 145, 149 (1999) for support of this argument.

While *Anderson* reiterated the right of an accused to have the finders of fact evaluate witness demeanor, the decision held, in pertinent part, that Technical Sergeant Anderson's Sixth Amendment rights were not violated when child witness testimony was shielded from Anderson's view. In so holding, the Court noted that "the arrangement of televisions and screens was such that all parties could see each child testify." *Anderson*, 51 M.J. at 150. Accordingly, since the members could see and evaluate the witnesses' demeanor, *Anderson* is of little assistance in resolving the constitutional issues where some members did not see all the witnesses.

Of great importance in this case is the fact that the defense offered no objection to the detailing of new members and the reading of testimony to those new members, as provided for in R.C.M. 805(d)(1). While there was no explicit waiver of Confrontation Clause rights by the appellant, the record clearly supports a *de facto* waiver of the issue. Moreover, when the defense requested that two critical witnesses be recalled so that the new members could evaluate their demeanor, the military judge granted the request, over Government objection. Under these facts, and in the absence of compelling authority, we must reject this assignment of error. *See United States v. McGeeney*, 41 M.J. 544, 552 (N.M.Ct.Crim.App.1994)(no denial of Confrontation Clause right where panel fell below quorum after three Government witnesses testified, motion for mistrial was denied, testimony of witnesses was read to new members, and military judge recalled one of the witnesses whose physical appearance was a material fact in her testimony), *aff'd*, 44 M.J. 418 (1996).

We next turn our attention to the related issue of mistrial. In a summary assignment of error, the appellant essentially contends that the military judge committed plain error by failing to *sua sponte* order a mistrial when the panel fell below quorum.

The only authority offered for this argument is R.C.M. 805(b), which simply states the requirement that a quorum of three members is essential. However, we also consider the Discussion and Analysis accompanying R.C.M. 805(d)(1), quoted previously, which suggest that a mistrial should be the normal course of action when the panel falls below quorum.

Had the military judge denied a defense motion for mistrial and pressed on with trial under the provisions of R.C.M. 805(d)(1), we would be more inclined to consider granting relief. However, when the defense makes no motion, and indeed, agrees with the Government's proposal for new members and reading the record to the new members, we are hard pressed to find any prejudice.

"Declaration of a mistrial is a drastic remedy, and such relief will be granted only to prevent a manifest injustice against the accused." *United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A.1990); *accord McGeeney*, 41 M.J. at 551. "The decision to grant a mistrial rests within the military judge's discretion, and we will not reverse his determination absent clear evidence of abuse of discretion." *Rushatz*, 31 M.J. at 456. We conclude that this record is bereft of any sign of abuse of discretion by the military judge.[7]

### Conclusion

The findings of guilty of Charge I and the Specification thereunder are set aside. Charge I and the Specification are dismissed. The remaining findings are affirmed. Having reassessed the sentence under the principles set forth in *United States v. Cook*, 48 M.J. 434, 438 (1998) and *United States v. Sales*, 22 M.J. 305, 307 (C.M.A.1986), we conclude that the approved sentence is both appropriate and free of all prejudice caused by the trial error. We affirm the approved sentence, as approved on review below.

Judge CARVER and Judge BRYANT concur.

---

7. In fact, we commend the military judge for his deft and patient handling of such a troublesome issue, particularly when the panel fell below quorum after most of the evidence had been received.