**UNITED STATES**

v.

**Staff Sergeant Ray A. VAZQUEZ,
United States Air Force.**

**ACM 37563.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 8 June 2009.[1]

27 April 2012.

Appellate Counsel for the Appellant: William E. Cassara, Esquire (civilian counsel) (argued); Lieutenant Colonel Gail E. Crawford; Lieutenant Colonel Darrin K. Johns; Major Shannon A. Bennett; Major David P. Bennett; and Captain Nathan A. White.

Appellate Counsel for the United States: Major Scott C. Jansen (argued); Colonel Don M. Christensen; Lieutenant Colonel Linell A. Letendre; Lieutenant Colonel Jeremy S. Weber; Major Naomi N. Porterfield; Major Michael T. Rakowski; and Gerald R. Bruce, Esquire.

Before GREGORY, ROAN, and HARNEY, Appellate Military Judges.

OPINION OF THE COURT

ROAN, Judge:

Contrary to his pleas, the appellant was convicted of one specification of aggravated sexual contact with a child under the age of 12, in violation of Article 120, UCMJ, 10 U.S.C. § 920. The adjudged sentence consisted of a dishonorable discharge, 8 years of confinement, forfeitures of all pay and allowances, reduction to Airman Basic, and a reprimand. The convening authority approved the sentence as adjudged.

1. We note that the court-martial order (CMO) contains an incorrect sentence date and both the Action and CMO fail to contain the reprimand language. We order the promulgation of a corrected CMO after a new Action is accomplished.

The appellant raises three issues for our consideration:

I. Whether the appellant was denied his Sixth Amendment[2] right to confrontation when the military judge admitted the alleged victim's statements to her mother as residual hearsay.

II. Whether the military judge abused his discretion when he admitted the alleged victim's statement to Dr. Hollander pursuant to Mil. R. Evid. 803(4) where there was no evidence of a medical diagnosis and no expectation of a medical benefit.

III. Whether the evidence is legally and factually insufficient to support the finding of guilty for aggravated sexual contact with a child where the Government failed to prove beyond a reasonable doubt that the appellant engaged in sexual contact with the alleged victim.

This Court specified three additional issues for consideration:

IV. Whether the appellant's due process rights were violated when the testimony of the majority of the Government's witnesses, to include the purported victim, AM, was read to two of the court-martial panel members in accordance with Rule for Courts–Martial (R.C.M.) 805(d)(1) while the other four members were able to observe the in-court demeanor of the same witnesses.

V. Did the military judge err to the substantial prejudice of the appellant by not sua sponte declaring a mistrial in accordance with R.C.M. 915(a) when a court member was dismissed and two new members were added after the Government had presented the majority of its case.

VI. Did the military judge err to the substantial prejudice of the appellant under the unique circumstances of this case by not inquiring of the parties, in accordance with R.C.M. 915(b), whether a mistrial should be granted when a court member was dismissed and two new members were added after the Government had presented the majority of its case.

Having reviewed the record of trial and the parties' arguments and briefs, we find that the appellant's right to military due process was violated, resulting in a fundamentally unfair trial. The findings of guilty to the charge and its specification, as well as the sentence, are set aside and dismissed.[3]

*Background*

AM was the 4–year–old daughter of Staff Sergeant (SSgt) DG and step-daughter of Petty Officer Second Class (PO2) UG. PO2 UG was the appellant's former roommate during the ten months before he married SSgt DG. SSgt DG and PO2 UG considered the appellant part of their family. The trio had dinner together several nights each week and often spent the night at each other's homes. AM referred to the appellant as "Uncle Ray."

About two weeks before the appellant deployed to Iraq, he mentioned to PO2 UG that he would like to spend time with AM. He did not request a specific day or time to meet with her. Neither SSgt DG nor PO2 UG voiced any concerns or reservations about the request. On 18 September 2008, without prior coordination, PO2 UG brought AM to the appellant's house for the visit. The appellant took AM to a local McDonald's restaurant. PO2 UG returned to the appellant's house approximately an hour later. He testified that he observed the appellant and AM in the living room. AM was sitting on the couch in her normal clothes and appeared to be half-asleep.

On 28 September 2008, AM told SSgt DG, "Mommy, Uncle Ray made me lick her body."[4] SSgt DG questioned AM about what happened and then called PO2 UG to inform him of the allegation. They agreed to do nothing until PO2 UG returned from his temporary duty location. On 3 October 2008, SSgt DG reported the allegation to the Fami-

2. U.S. CONST. amend. VI.

3. Given our ruling, it is unnecessary to consider the remaining issues.

4. Testimony at trial revealed that AM often confused pronouns.

ly Advocacy Office who then referred SSgt DG to the emergency room at the Urgent Care Clinic (UCC). At the UCC, AM was seen by a pediatrician, Dr. Hollander. SSgt DG told Dr. Hollander that she believed her daughter had been sexually abused.

Dr. Hollander thoroughly examined AM, looking for signs of abuse. As he examined her, Dr. Hollander asked AM if anyone had ever touched her private area, to which she stated, "Uncle Ray," and when he asked her where Uncle Ray touched her, AM pointed to her groin. Using a doll, Dr. Hollander asked AM to show him where she was touched. AM pointed to the doll's groin area. Dr. Hollander further asked AM if Uncle Ray had asked her to do something, and AM stated, "he told me to bite her," and when asked who "her" was, AM stated "Uncle Ray."

The matter was investigated by the local Air Force Office of Special Investigations (AFOSI). AFOSI special agents arranged a pretext phone call between PO2 UG and the appellant. PO2 UG called the appellant in Iraq, and spoke with him for approximately 15–17 minutes while AFOSI special agents monitored the conversation. PO2 UG asked the appellant if he had ever touched AM. The appellant adamantly denied the allegation.

The appellant was subsequently charged with aggravated sexual contact with a child, in violation of Article 120, UCMJ. Prior to the members being seated, the Government requested that AM be permitted to testify remotely in accordance with Mil. R. Evid. 611. In support of the motion, a forensic psychiatrist, Dr. Benedek, testified that she believed AM would suffer emotional trauma if required to testify in the appellant's presence. The military judge found that the requirements of Mil. R. Evid. 611(d)(3)(B) were met and permitted AM to testify in a separate room via closed-circuit TV in accordance with R.C.M. 914(a). The military judge, members, counsel, and the accused were able to observe AM while she testified.

The salient portions of AM's testimony were:

—That "Uncle Ray" told her to "lick his body."

—When asked what the appellant's body looked like, AM stated, "nasty," and then drew what she described as an "oval."

—When asked by trial counsel what her scariest day was, she replied, "I fell down." Asked what her saddest day was, she replied, "Making crafts. I made crafts at school."

—When asked if the appellant asked her to do anything, she replied, "[h]e just told me to lick his body."

On cross-examination, trial defense counsel's only question was whether AM remembered him, to which she replied, "yes."

### Court Members

Following voir dire, the general court-martial panel consisted of five officers, to include First Lieutenant (Lt) Conn. Lt Conn initially indicated that he did not know any of the potential witnesses in the case, to include SSgt DG. The panel members then heard testimony from AM, PO2 UG, Dr. Hollander, Special Agent Ferguson, and the Government's expert, Dr. Benedek. The Government's last witness was SSgt DG. Prior to her testimony, Lt Conn informed the military judge that he recognized SSgt DG after seeing her in the witness waiting area. Lt Conn explained that he was a squadron section commander and was SSgt DG's "rater's rater" for performance reporting purposes. The defense counsel asked the military judge to excuse Lt Conn from the panel for implied bias. The military judge agreed and excused Lt Conn under the liberal grant mandate.

Because the remaining four panel members did not comprise a sufficient quorum for a general court-martial, the military judge adjourned the court until the convening authority detailed new members. Two days later, the convening authority detailed five additional officers to the court-martial, in accordance with R.C.M. 505(c)(2)(B).[5] After

---

**5.** Rule for Courts–Martial (R.C.M.) 505(c)(2)(B) states: "New members may be detailed after assembly only when, as a result of excusals un-der subsection (c)(2)(A) of this rule, the number of members ... is reduced below a quorum...." *Id.*

voir dire, three of the five members were excused, leaving Captain (Capt) Soriano and Lt Castaneda to join the four members from the original panel. Consequently, six members were present when the court-martial resumed.

Following the procedure set out in R.C.M. 805(d)(1),[6] the military judge ordered the production of a verbatim transcript and the trial counsel and assistant trial counsel read the testimony of the five Government witnesses to Capt Soriano and Lt Castaneda (the original four members were not present during this period).[7] The trial defense counsel neither objected to the trial counsel's reading of the witness' testimony nor did he request a mistrial. Afterwards, SSgt DG testified before all six members. The appellant then testified and forcefully denied the charge.

### Military Due Process

Military appellate courts have long recognized that there are certain "fundamental rights inherent in the trial of military offenses which must be accorded to an accused before it can be said that he has been fairly convicted." *United States v. Clay*, 1 C.M.R. 74, 77, 1951 WL 1512 (C.M.A.1951). These military due process rights are drawn from standards established by Congress to ensure an accused receives a fair trial. *Id.; see also United States v. Hughes* 48 M.J. 700, 732 (A.F.Ct.Crim.App.1998) (Snyder, S.J., concurring in part and concurring in the result) ("Ensuring a fair trial is the bedrock of military due process and the *raison d'être* of the trial judiciary."). The Court of Appeals for the Armed Forces has recognized that the role of the service courts is "intended to not only uphold the law, but provide a source of structural integrity to ensure the protection of service members' rights within a system of military discipline." *United States v. Jenkins*, 60 M.J. 27, 29 (C.A.A.F.2004).

■ The appellant's trial implicates several aspects of military due process, including the right to confrontation, the right to a properly instructed panel, the right for each panel member to evaluate the evidence, and the right to a fair and impartial panel. We hold that the appellant was not afforded a fundamentally fair trial, as guaranteed by military due process and the UCMJ, when two of the six court members were added to the panel after five of the Government's six witnesses had already testified and thus did not receive a substantial portion of the Government's evidence in the same manner as the other four panel members.

### Right to Confrontation

The right to confrontation is a cornerstone of the criminal justice system and is a fundamental right afforded to every accused. "There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The right to confrontation applies to military courts-martial. *United States v. Stombaugh*, 40 M.J. 208, 211–12 (C.M.A.1994).

The protections afforded by the Confrontation Clause ensure evidence admitted against an accused is reliable and subject to rigorous adversarial testing. *Kentucky v. Stincer*, 482 U.S. 730, 737, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987); *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (plurality opinion) (quoting *California v. Green*, 399 U.S. 149, 161, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (second alteration added)) ("[T]he mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a

---

6. The relevant portion of R.C.M. 805(d)(1) is as follows: "When after presentation of evidence on the merits has begun, a new member is detailed under R.C.M. 505(c)(2)(B), trial may not proceed unless the testimony and evidence previously admitted on the merits, if recorded verbatim, is read to the new member...." *Id.*

7. The military judge permitted trial counsel to give a new opening statement to Captain (Capt) Soriano and First Lieutenant (Lt) Castaneda. The defense elected to make its initial opening statement at the beginning of its case-in-chief.

satisfactory basis for evaluating the truth of the [testimony].' ").

While case law discussing the Confrontation Clause has generally dealt with the accused's right to physical face-to-face confrontation with the witnesses against him, *e.g., Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); *United States v. Anderson,* 51 M.J. 145 (C.A.A.F.1999), the Supreme Court has consistently recognized that a separate objective of the right of confrontation is "to guarantee that the fact finder had an adequate opportunity to assess the credibility of witnesses." *Berger v. California,* 393 U.S. 314, 315, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969) (citing *Barber v. Page,* 390 U.S. 719, 721, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968)); *see also California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). As the Supreme Court pointed out in *Green,* the Confrontation Clause "permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *Green,* 399 U.S. at 158, 90 S.Ct. 1930.

In cases like the one at bar, where the jury has to rely heavily on testimonial evidence to "decide the [accused]'s fate," observing and assessing the demeanor of a witness is a crucial function of the jury. A witness's " 'demeanor' evidence … describes or portrays '[o]utward appearance or behavior, such as facial expressions, tone of voice, gestures, and the hesitation or readiness to answer questions' … In its traditional sense, demeanor merely refers to the nonverbal conduct of a testifying witness or of the accused while on the witness stand or in the courtroom…." *United States v. Clark,* 69 M.J. 438, 444 (C.A.A.F.2011).

Witness demeanor is an important aspect of the fact finders' credibility determinations:

> Witness' demeanor has long been regarded as a primary "method of ascertaining the truth and accuracy of their narratives."…
> Judge Learned Hand articulated the importance of demeanor evidence:
>> The words used are by no means all that we rely on in making up our minds about the truth of a question … a jury … may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness … [S]uch evidence may satisfy the tribunal, not only that the witness's testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.
>
> … Irrespective of its potential pitfalls when analyzed with other factors, such as consistency and corroboration, demeanor evidence is still one of the best guides to judging a witness's credibility.

James P. Timony, *Demeanor Credibility,* 49 Cath. U.L.Rev. 903, 918–20 (2000) (internal citations omitted).

Witness credibility is determined by more than just what words are said at trial. "There are many things sometimes in the conduct of a witness upon the stand, and sometimes in the mode in which his answers are drawn from him through the questioning of counsel, by which a jury are to be guided in determining the weight and credibility of his testimony." *Aetna Life Ins. Co. v. Ward,* 140 U.S. 76, 88, 11 S.Ct. 720, 35 L.Ed. 371 (1891). At trial, Capt Soriano and Lt Castaneda were unable to "look at [the Government's first five witnesses], and judge by [their] demeanor upon the stand and the manner in which [they] g[a]ve [their] testimony whether [they are] worthy of belief." *Ohio v. Roberts,* 448 U.S. 56, 64, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), *abrogated on other grounds by Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (quoting *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895)). Consequently, the appellant was not afforded his full right to confrontation.

### Credibility Instruction

Evaluating witness demeanor ties in with another bedrock principle of American jurisprudence: the credibility of witness testimony is to be determined by a properly instructed jury. *Hoffa v. United States,* 385 U.S. 293, 311, 87 S.Ct. 408, 17 L.Ed.2d 374

(1966); *United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F.2006); *United States v. Collier*, 1 M.J. 358, 366 (C.M.A.1976); *United States v. Bins*, 43 M.J. 79, 85 (C.A.A.F.1995) (The weight and credibility of a witness's testimony are issues for the members alone to decide.). In addition to the confrontation defect, R.C.M. 805(d)(1) prevented Capt Soriano and Lt Castaneda from complying with the military judge's instructions. Prior to deliberations, the military judge provided the following instruction to the members:

> You have the duty to determine the believ-ability of the witnesses. In performing this duty you must consider each witness' intelligence, ability to observe and accu-rately remember, **sincerity and conduct in court,** prejudices and character for truthfulness. Consider also the extent to which each witness is either supported or contradicted by other evidence; the rela-tionship each witness may have with each side; and how each witness might be af-fected by the verdict ... taking all these matters into account, you should then con-sider the probability of each witness' testi-mony and the inclination of the witness to tell the truth. The believability of each witness' testimony should be your guide in evaluating testimony and not the number of witnesses called.

(Emphasis added). Panel member compli-ance with a military judge's instructions is an indispensable component of military due pro-cess. In *United States v. Bishop*, 21 M.J. 541 (A.F.C.M.R.1985), this Court set aside a conviction after a panel member fell asleep during findings instructions, concluding that the appellant did not receive a fair trial. We said:

> Properly informed court members are es-sential to a fair trial. We accept that not all instances of inattentive court members require appellate attention. However, at-tention during instructions is crucial. All court members must receive proper in-structions at the appropriate stages of the trial. R.C.M. 920 requires the military

judge to give instructions on findings after arguments by counsel and before the mem-bers close to deliberate on findings. This requirement for instruction would be meaningless if the military judge were only required to give instructions to some of the court members. The whole idea behind instructions is a recognition of how impor-tant it is for all court members to receive uniform guidance on the law and proce-dures necessary to perform their duties properly.

*Id.* at 543. Citing the Court of Military Appeals' decision in *United States v. Groce*, 3 M.J. 369 (C.M.A.1977), we reiterated that "the most perfect instructions are inconse-quential if they fall upon inattentive ears. Uninformed court members cannot be al-lowed to circumvent the right of an accused to a fair trial." *Bishop*, 21 M.J. at 543. *See also United States v. Brown*, 3 M.J. 368 (C.M.A.1977) ("It is beyond argument that court members cannot preserve the accused's right to a fair trial without being attentive to adequate instructions and properly applying them to the case under consideration.").

The same rationale applies to members who are replaced mid-trial and could not observe and judge the credibility of the pre-vious witnesses. Both Capt Soriano and Lt Castaneda were incapable of complying with the military judge's charge to "consider each witness' intelligence, ability to observe and accurately remember, sincerity and conduct in court, prejudices and character for truth-fulness." Therefore, the military judge's in-struction to judge the credibility of witnesses essentially fell on deaf ears.

This failure is more than de minimis. This case was essentially a credibility contest be-tween a military member and a 4–year–old child. There was no physical evidence to support the allegation and the majority of the Government's evidence was based on AM's testimony or testimony based on AM's hearsay.[8] Further, the appellant testified under oath and denied AM's accusations.

8. The Government concedes the crucial impor-tance of AM's testimony, arguing that based on her in-court statements alone, the appellant's conviction was legally and factually sufficient. As it briefed: "There was other evidence for

sure, and the Appellant's own testimony did not ultimately help him, but quite frankly if the mem-bers did not believe AM, then all the other testi-mony about what AM told others would not have made a bit of difference."

There is probably no more difficult task placed on fact finders than the responsibility of determining which of two contradictory witnesses is telling the truth. It is not uncommon for two people to hear the same testimony and draw different conclusions concerning its accuracy. A fact finder frequently may choose to believe portions of a witness's testimony and disbelieve others. This belief may be based on corroboration, consistency, detail, or some other subjective factor. The ability to determine a witness's credibility by their in-court testimony presupposes the member was actually able to observe his or her demeanor. Given the circumstances of the appellant's case, that did not occur.[9]

### Article 16, UCMJ

Military members have a statutory right to a panel of members in all general and special courts-martial. Article 16, UCMJ, 10 U.S.C. § 816; *United States v. Leonard,* 63 M.J. 398, 399 (C.A.A.F.2006). If an accused is entitled to have a "jury" determine his fate, that right must include, at a minimum, having the same jury present for the entire trial.[10] The fundamental purpose of a jury is the "interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." *Williams v. Florida,* 399 U.S. 78, 100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). Indeed,

A central facet of this deliberative process is that individual jurors harmonize their individual recollections and perceptions of the trial proceedings. This collective effort to piece together a coherent and consistent story often exposes deceptions or distortions, sometimes subtle, that may otherwise be overlooked . . . In the case of an absent juror, the collective effort is short-circuited because one of the participants lacks the ability to fully evaluate the

testimony he missed, or to challenge others' impressions of witnesses or their recollections of specific exchanges.

*United States v. Olano,* 62 F.3d 1180, 1210 (9th Cir.1995) (Reinhardt, J., dissenting) (internal citation omitted).

As Judge Reinhardt aptly stated, "A jury as an entity is neither more nor less than the sum of its parts. For the entity to exist, all of its members need be present, and when one or more is absent from a part of the trial, then the jury as an entity is also absent. To proceed with a 'jury trial' in the absence of the jury is to proceed with a structurally flawed process." *Id.* at 1209. We agree.

In this case, the "collective effort" of the members was short-circuited. The two "new" members could not fully evaluate all the evidence, to include the demeanor and credibility of the missed witnesses. They could not effectively participate in the discussion and challenge the other panel members' impressions or their recollections of specific exchanges.

When a jury deliberates, its members debate, exchange ideas and persuade—all in the hope of reaching a consensus. The courts encourage this process, for without it a verdict would never be reached. As jury members discuss a case, they fill in the gaps for each other; what one has missed, another provides.

There are no guarantees that each jury member will remember all the specific details of each witness' testimony or recall it in the same manner. The factors each juror will rely upon to evaluate evidence will largely be a function of the juror's experience.

Nancy Lawler Dickhute, *Jury Duty for the Blind in the Time of Reasonable Accommodations: The ADA's Interface with a Litigant's Right to a Fair Trial.* 32 Creighton

---

**9.** An apt analogy to the due process problems created by application of R.C.M. 805(d)(1) is the prohibition of human lie detector testimony and discussion of polygraph results at trial. Such evidence materially prejudices the rights of the accused because it usurps the jury's exclusive function to weigh evidence and determine credi-

bility. *United States v. Birdsall,* 47 M.J. 404, 410 (C.A.A.F.1998).

**10.** Members released in accordance with R.C.M. 505(c)(2)(A) in which a quorum is still maintained would not violate military due process.

L.Rev. 849, 877–78 (1999) (internal citations omitted).[11]

### Impartial Panel

"As a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel." *United States v. Richardson*, 61 M.J. 113, 118 (C.A.A.F.2005) (quoting *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F.2001)); *see also United States v. Dowty*, 60 M.J. 163 (C.A.A.F.2004) (military defendant has a right to members who are fair and impartial; this right is the cornerstone of the military justice system). We cannot ignore the possibility, if not probability, that the four original members exerted an inordinate amount of influence during deliberations.[12] Certainly, Capt Soriano and Lt Castaneda could not deliberate on an even playing field with the original four members. As discussed above, they did not have the ability to independently determine and assess for themselves the same evidence available to the original members.

We find that implicit in the concept of a fair and impartial panel is the obligation to have members present who have all heard and seen the same material evidence. As such, the appellant's military due process rights in this regard were violated.

### Waiver

█ The Government argues that the appellant waived his right to contest the due process concerns now raised because he did not object at trial. An appellant's failure to object at trial results in either a forfeiture or waiver of that issue during appellate review. "A forfeiture is basically an oversight; a waiver is a deliberate decision not to present a ground for relief that might be available in law." *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F.2009) (quoting *United States v. Cook*, 406 F.3d 485, 487 (7th Cir.2005)). Our

superior court recently reiterated that "[t]here is a presumption against the waiver of constitutional rights, and for a waiver to be effective it must be clearly established that there was an intentional relinquishment of a known right or privilege." *United States v. Sweeney*, 70 M.J. 296, 303–04 (C.A.A.F.2011) (quoting *United States v. Harcrow*, 66 M.J. 154, 157 (C.A.A.F.2008)).

The Government argues the appellant "intentionally waived whatever constitutional protections he may have had as a trial tactic or strategy." In essence, the Government contends that the appellant had ample time to object to the application of R.C.M. 805 and/or to request a mistrial but chose not to. His silence therefore amounted to a deliberate decision to support the military judge's application of R.C.M. 805. We do not find this argument persuasive.

Military appellate courts have consistently held that defense counsel's "failure to object at trial does not waive a denial of a fair trial or a violation of due process of law." *Groce*, 3 M.J. at 371 (quoting *United States v. Stringer*, 16 C.M.R. 68, 72, 1954 WL 2430 (C.M.A.1954) ("[A]n appellate court, in criminal cases, may consider claimed error which would result in a manifest miscarriage of justice, or would otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.")). The addition of Capt Soriano and Lt Castaneda so far into the trial proceedings resulted in a fundamentally unfair trial for the appellant and constitutes an error that "materially prejudices the rights" of the appellant. Article 59, UCMJ, 10 U.S.C. § 859. As we said in *Bishop*, "The critical issue is not who was responsible, but whether the appellant had a fair trial. When we find, as we have in this case, that an appellant has not had a fair trial, then some remedy is required regardless of who is to blame for the error." *Bishop*, 21 M.J. at 543.

---

**11.** Our decision does not stand for the proposition that failure to observe each witness testify automatically violates military due process. To do so would render all hearsay exemptions, or other forms of out-of-court testimony, to include depositions, essentially invalid, a result we obviously do not reach. Rather, we find a due process violation in the appellant's case in part because two-thirds of the panel received decisive evidence in a completely different way than did the remaining third.

**12.** Even if Capt Soriano and/or Lt Castaneda may have raised concerns about not being able to observe the witnesses during deliberations, we cannot overlook that the appellant could have been convicted based solely on the findings of the original four members.

Accordingly, we conclude that, under the facts of this case, the defense's failure to object to this process or move for a mistrial did not constitute a waiver of the error.

The Government urges this Court to follow the Navy–Marine Corps court's decision in *United States v. Camacho,* 58 M.J. 624 (N.M.Ct.Crim.App.2003). In *Camacho,* a panel member was excused after both sides had finished their findings case-in-chief and the defense had completed its surrebuttal case. The excusal resulted in the panel falling below the required quorum for a special court-martial. *Id.* at 626, 631–32. Two new members were detailed to the court and all prior witness testimony and opening statements were read to the new members. In addition, the military judge granted a defense request to have two previous witnesses recalled to provide testimony to the entire panel "in supplementation" of their earlier testimony. *Id.* at 632. Defense counsel did not request a mistrial. *Id.* On appeal, the appellant argued that R.C.M. 805(d)(1) was unconstitutional because it violated his right to: (1) a fair trial, (2) substantive due process, and (3) equal protection. In affirming the appellant's conviction, the Navy–Marine Corps court did not directly address the constitutional issue, finding that the appellant's failure to object at trial constituted a "de facto" waiver of any potential Confrontation Clause violation. The court found the appellant suffered no prejudice, noting that the judge had granted the defense request to recall two critical witnesses so the new panel members could evaluate their demeanor. *Id.* at 633.

Given the nature of the testimony in this case, we do not find *Camacho* persuasive. Although trial defense counsel in the present case did not object to the reading of the witness testimony nor ask for a mistrial, we find the appellant did in fact suffer prejudice because his due process right to a fair trial was violated. Consequently, we decline to follow *Camacho.*[13]

*Military Judge's Role*

■ The responsibility for protecting the appellant's due process rights does not lie solely at the feet of his defense counsel. The military judge has an independent duty to insure that the appellant received a fair trial. *United States v. Fleming,* 38 M.J. 126, 129 n. * (C.M.A.1993); *United States v. Watt,* 50 M.J. 102, 105 (C.A.A.F.1999). Given the unique facts of this case, the military judge should have declared a mistrial when Lt Conn was released. We find that his failure to do so was an abuse of discretion.

R.C.M. 915(a) states, "The military judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings." *Id.* R.C.M. 915(b) states, "On motion for a mistrial *or when it otherwise appears that grounds for a mistrial may exist,* the military judge *shall* inquire into the views of the parties on the matter. . . ." *Id.* (emphasis added). There is no indication in the record that the military judge discussed with either the counsel or the accused whether a mistrial was appropriate.

While the Government is correct that a mistrial is a drastic remedy and should be used as a last resort, such relief is appropriate in order to prevent manifest injustice or whenever circumstances arise that cast substantial doubt upon the fairness or impartiality of the trial. *United States v. Diaz,* 59 M.J. 79 (C.A.A.F.2003). In this instance, the military judge should have recognized that application of R.C.M. 805(d)(1) would result in a patently unfair trial and would not "preserve the ends of public justice." *United States v. Jeanbaptiste,* 5 M.J. 374, 376 (C.M.A.1978) (quoting *United States v. Simonds,* 36 C.M.R. 139, 142, 1966 WL 4431 (C.M.A.1966)). Given the critical importance of the evidence provided by the five witnesses, reading the trial transcript to the panel members was an inadequate substitution for the witness' in-court testimony. As

13. In making this decision, we do not find Article 29, UCMJ, 10 U.S.C. § 829, or R.C.M. 805(d)(1)

to be facially unconstitutional.

such, there was no procedural method, short of having each witness testify again, that would ensure the appellant received the full due process protections afforded by the UCMJ. We find that, under the facts of this case, the military judge had a sua sponte duty to declare a mistrial.[14]

*Conclusion*

A violation of the appellant's military due process rights are per se prejudicial and mandate reversal of the appellant's conviction. "Under our powers as an appellate court we can reverse for errors of law which materially prejudice the substantial rights of the accused, and we need go no further than to hold that the failure to afford to an accused any of the enumerated rights denied him military due process and furnishes grounds for us to set aside the conviction." *Clay*, 1 C.M.R. at 77–78; *see also United States v. Jerasi*, 20 M.J. 719, 723 (N.M.C.M.R.1985) (a violation of military due process "demands a finding that the denial was *per se* materially prejudicial to the substantial rights of the accused. No search for prejudice is ever undertaken ... [because] denial of a congressionally created right is, under military due process, always materially prejudicial—as a matter of law.").[15] The findings and the sentence are set aside. The charge is

DISMISSED.

**ORDER**

**Special Panel**

On 19 March 2012, this Court set aside the findings and sentence and dismissed the charge against the appellant (*United States v. Vazquez*, 71 M.J. 513, 2012 WL 1059014 (A.F.Ct.Crim.App.2012)). On 18 April 2012, the appellee filed a Motion for Reconsideration *En Banc* with this Court in accordance with Rules 17 and 19 of this Court's Rules of Practice and Procedure.

Accordingly, it is by the Court on this 27th day of April, 2012,

**ORDERED:**

That the appellee's Motion for Reconsideration *En Banc* is hereby **DENIED.**

It is further ordered that the appellee's Motion for Reconsideration before the original panel is hereby **GRANTED.**

No briefs will be filed in this case.

This Court's 19 March 2012 decision in the above-styled case is withdrawn and replaced with the opinion issued contemporaneous with this order.

14. Unfortunately, the drafters of the current *Manual for Courts–Martial, United States* (*MCM*), removed a very useful comment that previously appeared in the discussion following R.C.M. 805. The note warned the military judge, "When a court-martial panel has been reduced below a quorum, a mistrial may be appropriate." *MCM*, II–79 (2005 ed.). We highly recommend this language be reinserted in subsequent versions of the *Manual*. We note that the Drafter's Analysis for R.C.M. 805(d) still states: "This subsection provides a means to proceed with a case in the rare circumstance in which a court-martial is reduced below a quorum after trial on the merits has begun and a mistrial is inappropriate." *MCM*, A21–47 (2008 ed.).

15. In our original 19 March 2012 opinion, we inadvertently left the impression that our decision was based on a Constitutional structural error analysis as discussed in *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). That was neither our intent nor the basis for our holding. For the reasons discussed above, we conclude the appellant's right to military due process was denied and the military judge erred by not declaring a mistrial. As a result, the appellant's court-martial did not reliably serve its function as a vehicle for determination of guilt or innocence.